UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN THE MATTER OF CANAL BARGE COMPANY, INC., AS THE OWNER OF BARGE CBC 763, PETITIONING FOR EXONERATION FROM AND/OR LIMITATION OF LIABILITY

CIVIL ACTION

NO. 20-1771

SECTION M (1)

## ORDER & REASONS

Before the Court is the motion of limitation petitioner Canal Barge Company, Inc. ("Canal Barge") for summary judgment.[1] Claimant Christopher J. Landry opposes the motion.[2] Canal Barge replies in further support of its motion.[3] Having considered the parties' memoranda, the record, and the applicable law, the Court issues this Order & Reasons granting the motion.

**I.    BACKGROUND**

This is a case involving a personal injury caused by a pressurized vessel hatch cover blowing open and striking a maritime worker's head. Canal Barge owns the Barge CBC 763 (the "Barge") which it sent to Basin Fleeting, Inc. ("Basin Fleeting") for "necessary repair and maintenance work."[4] On September 25, 2019, a certified marine surveyor inspected the Barge and made recommendations for repairs.[5] While the survey did not note defects in any hatch cover, gasket, O-ring, T-bolt or chain, it is unclear whether such parts were specifically inspected.[6] Canal Barge hired Basin Fleeting to complete welding work as "a portion of the port hull needed to be

---

[1] R. Doc. 20.
[2] R. Doc. 24.
[3] R. Doc. 28.
[4] R. Docs. 20-7 at 1; 24-1 at 1.
[5] R. Docs. 20-7 at 1; 24-1 at 1.
[6] R. Docs. 20-7 at 2; 24-1 at 1.

'cropped and renewed' with new steel plates."[7]  Basin Fleeting would also complete the routine maintenance of "reworking the hatches."[8]

The parties dispute the extent to which Basin Fleeting was required to inspect the hatch covers in completing this work.  Canal Barge states that "Basin Fleeting (and its employees) would check and inspect all the hatch covers on the Barge, make sure that all necessary components were there, and confirm that there are no defects or issues with any hatch covers."[9]  In contrast, Landry states that Canal Barge "only required that Basin [Fleeting] 'replace like any worn out gaskets and O-rings and T-bolts …' and never required more than a visual inspection, which cannot identify a defective T-bolt."[10]  Canal Barge relied upon Basin Fleeting to use "its employees' experience and expertise to perform this work as they deemed fit."[11]  However, Canal Barge provided the necessary repair parts "and has no specifications for T-bolts other than requiring a 'generic T-bolt … basically what we call a stainless steel T-bolt, you know, for an 18-inch hatch cover,' that's manufactured in China."[12]

Both parties agree that "[a]t all pertinent times, the Barge remained moored at Basin Fleeting's facility and in Basin Fleeting's custody and control."[13]  Before the Barge could be released back to Canal Barge, it had to be certified by an American Bureau of Shipping ("ABS") representative.[14]  As a component of the certification, the Barge must undergo an air pressure test

---

[7] R. Docs. 20-7 at 2; 24-1 at 1.
[8] R. Docs. 20-7 at 2; 24-1 at 1.
[9] R. Doc. 20-7 at 2.
[10] R. Doc. 24-1 at 1 (quoting R. Doc. 24-2 at 21).
[11] R. Doc. 20-7 at 3.
[12] R. Doc. 24-1 at 1 (quoting R. Doc. 24-2 at 8).
[13] R. Docs. 20-7 at 3; 24-1 at 2.
[14] R. Docs. 20-7 at 3; 24-1 at 2.

to ensure the hull is watertight and the welding repairs adequate.[15] While the hull is sealed and pressurized, the air pressure inside the hull is monitored for any air leaks.[16]

Landry was an employee of Basin Fleeting and "an experienced worke[r] and supervisor who had performed similar air pressure tests multiple times during the course of his career."[17] In preparation for the ABS certification, he conducted a test run the day before.[18] Landry realized that a hatch was leaking.[19] He "changed the O-ring and gasket on that hatch cover in order to fix the issue prior to the official air pressure test the next day."[20] Canal Barge did not know about, nor was it informed of, any problems during the pretest or with the hatch cover.[21]

On October 18, 2019, Landry "conducted and controlled" the official air pressure test.[22] Merlin Macke on behalf of Canal Barge and Mostafa Akhavannouri as a representative for ABS were also present though they did not direct Landry's actions in any way.[23]

After the hull was sealed and beginning to pressurize, Landry stated that "the hull was 'not filling up fast enough.'"[24] Landry, "on his own accord, went to tighten down a hatch while it was under pressure."[25] He did not think this was a dangerous choice "because he had 'done it multiple times' before."[26] Although he does not remember exactly how it happened, when he began to tighten the hatch, it blew off and struck him in the head.[27]

---

[15] R. Docs. 20-7 at 3; 24-1 at 2.
[16] R. Docs. 20-7 at 3; 24-1 at 2.
[17] R. Docs. 20-7 at 1, 5; 24-1 at 1-2.
[18] R. Docs. 20-7 at 4; 24-1 at 2.
[19] R. Docs. 20-7 at 4; 24-1 at 2.
[20] R. Docs. 20-7 at 4; 24-1 at 2.
[21] R. Docs. 20-7 at 4; 24-1 at 2.
[22] R. Docs. 20-7 at 4; 24-1 at 2.
[23] R. Docs. 20-7 at 4-5; 24-1 at 2.
[24] R. Docs. 20-7 at 5; 24-1 at 2.
[25] R. Docs. 20-7 at 5; 24-1 at 2.
[26] R. Docs. 20-7 at 6; 24-1 at 2.
[27] R. Docs. 20-7 at 5; 24-1 at 2.

Landry did not take any direction from Macke,[28] but Landry maintains that "Macke, as [Canal Barge's] barge maintenance superintendent and company representative maintained the authority to issue a stop work order."[29] However, "Macke did not even observe or see Landry tighten the hatch cover."[30]

## II.   PENDING MOTION

In its motion, Canal Barge argues that because it is a vessel owner who turned over control of its ship for repairs, it can only be held liable for violating the three narrow duties of care under *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156 (1981).[31] First, Canal Barge contends that it cannot have violated the turnover duty because the marine surveyor who inspected the vessel did not discover any defect.[32] Further, Basin Fleeting was hired to rework the hatches so part of its job was to repair any defects in the covers.[33] Second, Canal Barge argues that it did not violate the active control duty because Basin Fleeting and Landry controlled the air pressure test at the time of the injury.[34] Finally, Canal Barge asserts that it cannot have breached its duty to intervene because it did not have actual knowledge of the hazardous condition.[35] In essence, Canal Barge argues it relied on the expertise of Basin Fleeting and Landry to complete the work in a safe and reasonable manner.[36]

In opposition, Landry argues that the injury only occurred because the T-bolt Canal Barge chose to hold down the hatch cover was defective.[37] Landry contends that this is a violation of the

---

[28] R. Docs. 20-7 at 5; 24-1 at 2.
[29] R. Doc. 24-1 at 2.
[30] R. Docs. 20-7 at 6; 24-1 at 2.
[31] R. Doc. 20-1 at 2.
[32] *Id.* at 16.
[33] *Id.* at 16-17.
[34] *Id.* at 17-18.
[35] *Id.* at 18-20.
[36] *Id.* at 20.
[37] R. Doc. 24 at 1.

4

turnover duty because the bolt "was purchased in bulk [by Canal Barge] without any particular specifications" and contained a defect a visual inspection could not identify.[38] Second, Canal Barge must have violated the active control duty, Landry says, because Canal Barge retained control over the T-bolt inventory which Basin Fleeting was required to use.[39] Finally, Landry argues that Canal Barge violated its duty to intervene through its representative, Macke, who should have issued a stop-work order with respect to the air pressure test to ensure the faulty hatch was fixed in a safe and reasonable manner.[40]

## III. LAW & ANALYSIS

### A. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact. *Id*. at 323. If the moving party meets that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact. *Id*. at 324.

---

[38] *Id.* at 7-8.
[39] *Id.* at 9-10.
[40] *Id.* at 10-13.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). The substantive law identifies which facts are material. *Id*. Material facts are not genuinely disputed when a rational trier of fact could not find for the nonmoving party upon a review of the record taken as a whole. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *EEOC v. Simbaki, Ltd*., 767 F.3d 475, 481 (5th Cir. 2014). Unsubstantiated assertions, conclusory allegations, and merely colorable factual bases are insufficient to defeat a motion for summary judgment. *See Anderson*, 477 U.S. at 249-50; *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994); *Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994). In ruling on a summary-judgment motion, a court may not resolve credibility issues or weigh evidence. *See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co*., 530 F.3d 395, 398-99 (5th Cir. 2008). Furthermore, a court must assess the evidence, review the facts, and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment. *See Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014); *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001). Yet, a court only draws reasonable inferences in favor of the nonmovant "when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

After the movant demonstrates the absence of a genuine issue of material fact, the nonmovant must articulate specific facts showing a genuine issue and point to supporting, competent evidence that may be presented in a form admissible at trial. *See Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998); Fed. R. Civ. P. 56(c)(1)(A) & (c)(2). Such facts must create more than "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. When the nonmovant will bear the burden of proof at trial on the dispositive issue,

the moving party may simply point to insufficient admissible evidence to establish an essential element of the nonmovant's claim in order to satisfy its summary-judgment burden. *See Celotex*, 477 U.S. at 322-25; Fed. R. Civ. P. 56(c)(1)(B). Unless there is a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little*, 37 F.3d at 1075-76.

### B. *Scindia* Duties of Care

"In general, [33 U.S.C.] § 905(b) and *Scindia* allow for claims of negligence against vessel owners. The duties set forth in *Scindia* apply to any independent contractor and its employees covered by the [Longshore and Harbor Workers' Compensation Act]." *Aguilar v. Bollinger Shipyards, Inc.*, 833 F. Supp. 2d 582, 591 (E.D. La. 2011).[41] "As a general matter, the shipowner may rely on the stevedore to avoid exposing the longshoremen to unreasonable hazards." *Scindia*, 451 U.S. at 170. However, shipowners owe three general duties to maritime workers:

> The first, which courts have come to call the "turnover duty," relates to the condition of the ship upon the commencement of stevedoring operations. The second duty, applicable once stevedoring operations have begun, provides that a shipowner must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the "active control of the vessel." The third duty, called the "duty to intervene," concerns the vessel's obligations with regard to cargo operations in areas under the principal control of the independent stevedore.

*Howlett v. Birkdale Shipping Co.*, 512 U.S. 92, 98 (1994) (quoting *Scindia*, 451 U.S. at 167-68) (citations omitted). "A shipowner need not protect a longshoreman engaged in ship repairs 'from risks that were inherent in the carrying out of the contract.'" *Casaceli v. Martech Int'l, Inc.*, 774 F.2d 1322, 1330 (5th Cir. 1985) (quoting *West v. United States*, 361 U.S. 118, 123 (1959)).

---

[41] While much of the case law references "longshoremen" and "stevedores," the standards also apply to ship repairmen, independent contractors, and other maritime workers.

7

**1. Turnover duty**

The turnover duty can be separated into two duties: "(1) 'a duty to exercise ordinary care under the circumstances to turn over the ship and its equipment in such condition that an expert stevedore can carry on stevedoring operations with reasonable safety,' and (2) 'a duty to warn the stevedore of latent or hidden dangers which are known to the vessel owner or should have been known to it.'" *Sobrino-Barrera v. Anderson Shipping Co.*, 495 F. App'x 430, 434 (5th Cir. 2012) (quoting *Kirksey v. Tonghai Mar.*, 535 F.3d 388, 392 (5th Cir. 2008)). The vessel owner's duty extends only to "hazards that would be neither obvious to nor anticipated by a competent stevedore in the ordinary course of cargo operations." *Howlett*, 512 U.S. at 99. Even then the vessel owner must have actual knowledge of the defect or is imputed with knowledge "if the exercise of reasonable care would place upon the shipowner an obligation to inspect for, or discover, the hazard's existence." *Id.* at 100. "If obvious, [the defect] should have been as apparent to the stevedore as to the shipowner. It is contradictory to suggest that a careful shipowner should discover an apparent defect but that a careful stevedore may miss it with impunity." *Morris v. Compagnie Mar. Des Chargeurs Reunis, S.A.*, 832 F.2d 67, 69-70 (5th Cir. 1987).

Here, the only defect Landry contends existed when the Barge was turned over to Basin Fleeting is a T-bolt which Landry says failed to secure the hatch cover.[42] Landry submits no summary-judgment evidence that a T-bolt on the Barge was defective and caused the accident. He merely makes this assertion. As such, Landry has not begun to bear his burden on summary judgment. Regardless, neither party was aware of any defect in the bolt at the commencement of Basin Fleeting's work. Nor did the independent marine surveyor discover any such issue. Therefore, the question is whether Canal Barge, as the vessel owner, should have known of the

---

[42] R. Doc. 24 at 8.

8

alleged flaw in the bolt in the exercise of reasonable care to inspect the vessel. Both parties agree that a visual inspection would be insufficient to discover a flaw, and Landry fails to explain how any defect could have been discovered before the accident. It cannot be the case that a vessel owner must do more than a visual inspection – and, then, as to every bolt on every hatch – before turning the ship over to a repairer to repair and rework those very hatches. Further, the bolt at issue may have been replaced during the course of repairs.[43] Therefore, Canal Barge could not have known of the alleged defect at the time of the ship's turnover. Accordingly, Canal Barge could not have violated the turnover duty.

**2. Active control duty**

The active control duty imputes liability on the vessel owner "for injury caused by hazards under the control of the ship." *Singleton v. Guangzhou Ocean Shipping Co.*, 79 F.3d 26, 28 (5th Cir. 1996). "To determine whether a vessel owner retains active control over an area, this court generally considers whether the area in question is within the contractor's work area, whether the work area has been turned over to the contractor, and whether the vessel owner controls the methods and operative details of the stevedore's work." *Dow v. Oldendorff Carriers GMBH & Co.*, 387 F. App'x 504, 507 (5th Cir. 2010). "[T]he mere presence of vessel employees is not necessarily indicative of active control." *Manson Gulf, L.L.C. v. Mod. Am. Recycling Serv., Inc.*, 878 F.3d 130, 135 (5th Cir. 2017). "Mere presence of vessel personnel on the vessel at the time of the accident is insufficient in the absence of evidence that the [repairer's work] was in any way under the active control of the ship." *Aguilar*, 833 F. Supp. 2d at 592.

Here, Landry and Canal Barge agrees that "[a]t all pertinent times, the Barge remained moored at Basin Fleeting's facility and in Basin Fleeting's custody and control."[44] Both parties

---

[43] R. Doc. 24-1 at 1-3.
[44] R. Docs. 20-7 at 3; 24-1 at 2.

also agree that Landry "conducted and controlled" the air pressure test and that it was his decision to tighten the hatch cover while it was under pressure.[45] Landry argues that Canal Barge retained active control over the supply of replacement T-bolts. However, Canal Barge turned over the entire vessel for repairs to Basin Fleeting, and there is no indication that the bolt inventory specifically was "'equipment over which the vessel's crew retain[ed] operational control.'" *Bourda v. Seacor Marine, Inc.*, 2002 WL 10458, at *1 (E.D. La. Jan. 2, 2002) (quoting *Manuel v. Cameron Offshore Boats, Inc.*, 103 F.3d 31, 34 (5th Cir. 1997)). Macke's mere presence during the test as a representative of Canal Barge did not impute active control to the company. It is undisputed that Macke did not direct or instruct Landry in performing the air pressure test, and there is no evidence that either he or Canal Barge imposed any requirement concerning the use of equipment or parts, including, specifically, T-bolts. Unlike *Bourda*, where the court found summary judgment for the vessel owner inappropriate when the vessel's crew was actively involved with and participating in the cleaning operation, there is no dispute here that Canal Barge was not involved in the air pressure test. Macke and Canal Barge were relying on the experience of Landry to safely perform the test. As Canal Barge did not retain active control over the vessel or the performance of the test, it cannot have violated the active control duty.

### 3. Duty to intervene

"[T]he duty to intervene imposes liability 'if the vessel owner fails to intervene in the stevedore's operations when he has actual knowledge both of the hazards and that the stevedore, in the exercise of "obviously imprudent" judgment means to work on in the face of it and therefore cannot be relied on to remedy it.'" *Manson Gulf*, 878 F.3d at 134 (quoting *Burchett v. Cargill, Inc.*, 48 F.3d 173, 178 (5th Cir. 1995)). "This is a narrow duty that 'requires something more than

---

[45] R. Docs. 20-7 at 4, 6; 24-1 at 2.

mere shipowner knowledge of a dangerous condition.'" *Aguilar*, 833 F. Supp. 2d at 592 (quoting *Singleton*, 79 F.3d at 28). For example, courts should consider "whether the danger was open and obvious; whether the danger was located within the ship or ship's gear; which party created the danger or used the defective item and was therefore in a better position to correct it; which party owned and controlled the defective item; whether an affirmative act of negligence or acquiescence in the use of the dangerous item occurred; and whether the shipowner assumed any duty with regard to the dangerous item." *Casaceli*, 774 F.2d at 1328.

Landry argues that Macke should have exercised his stop-work authority to stop Landry from tightening the hatch. However, Macke did not even observe Landry go to tighten the hatch. Significantly, Macke did not have actual knowledge of any allegedly defective bolt so he, and Canal Barge, could not have had a duty to intervene. Landry's decision to tighten the hatch could not have been "obviously imprudent" as Landry himself admitted that he "had 'done it multiple times' before."[46] Landry points to no summary-judgment evidence to suggest otherwise. And Canal Barge was entitled to rely on Landry's experience in performing the test particularly when it had no actual knowledge of any hazardous condition. Therefore, it could not have violated the duty to intervene.

Ultimately, "a ship may not be found negligent merely because a condition of the ship that requires repair or inspection injures the person hired to inspect or repair that condition." *Hill v. Texaco, Inc.*, 674 F.2d 447, 452 n.5 (5th Cir. 1982). Here, Basin Fleeting was hired to rework the hatches on the Barge. Canal Barge is entitled to rely on Basin Fleeting's experience and expertise in completing the repairs. Although it is unfortunate that Landry was hurt in a way that was

---

[46] R. Docs. 20-7 at 6; 24-1 at 2.

unexpected even to him, his injury did not stem from a violation of Canal Barge's duties of care under *Scindia*.

## IV.    CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that the motion of limitation petitioner Canal Barge Company, Inc. for summary judgment is GRANTED.

IT IS FURTHER ORDERED that the claims of claimant Christopher B. Landry against limitation petitioner Canal Barge Company, Inc. are DISMISSED WITH PREJUDICE.

New Orleans, Louisiana, this 4th day of August, 2021.

                                                                                       BARRY W. ASHE
                                                                                       UNITED STATES DISTRICT JUDGE